UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

FEB 20 2013

JUDGE ELAINE E. BUCKLO
UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 13 CR 138 -2 |
| v. | ) | |
| | ) | Honorable Elaine E. Bucklo |
| HONEY HOLDING I, LTD., | ) | |
| d/b/a Honey Solutions | ) | |
| | ) | |

Defendant HONEY HOLDING I, LTD., d/b/a Honey Solutions, a Texas limited partnership with its principal place of business in Baytown, Texas, by and through its undersigned attorneys, pursuant to authority granted by its General Partner, and the United States Attorney's Office for the Northern District of Illinois, enters into this Deferred Prosecution Agreement. The terms and conditions of this Agreement are as follows:

## The Criminal Information

1.      HONEY HOLDING waives indictment and agrees to the filing of a one-count Information in the United States District Court for the Northern District of Illinois, charging it with a felony violation of the Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Section 301 *et seq.*, namely, that HONEY HOLDING, with intent to defraud and mislead, caused to be introduced and delivered for introduction into interstate commerce articles of food intended for human consumption, that is, honey that was adulterated within the meaning of Title 21, United States Code, Section 342(a)(2)(C)(i), in that the honey contained an unsafe food additive, that is, Chloramphenicol, an antibiotic not authorized in honey, by authorizing the purchase and delivery of the adulterated honey, which arrived at HONEY HOLDING's facility in Baytown, Texas on or about December 14, 2006, all in violation of Title 21, United States Code, Sections 331(a), 333(a)(2), 348(a), and Title 18, United States Code, Section 2. A copy of the Information is attached Appendix A.

## Acceptance of Responsibility

2.      HONEY HOLDING accepts and acknowledges responsibility for its

1

conduct and that of its employees and agents as set forth in the Factual Statement attached hereto and incorporated by reference herein as Exhibit A, as well as the additional conduct set forth in the Factual Statement, which constitutes relevant conduct under United States Sentencing Guidelines §1B1.3. HONEY HOLDING agrees that it shall not contest or otherwise challenge the admissibility into evidence of the Factual Statement, the facts contained within the Factual Statement, or any other document, testimony, or other evidence the USAO NDIL might use in any related criminal prosecution against HONEY HOLDING in the event of a material breach of this Agreement.

## Cooperation

3.     HONEY HOLDING agrees to cooperate fully with the USAO NDIL and with any other agency with which the USAO NDIL requests HONEY HOLDING to cooperate, regarding any matter about which HONEY HOLDING has knowledge. HONEY HOLDING's agreement to cooperate shall extend until the completion of law enforcement investigations of any criminal activity relating to the illegal importation and entry of honey into the United States, including any investigations or prosecutions of others, but in no event shall that cooperation be less than the duration of this Agreement, that is, twenty-four months.

4.     HONEY HOLDING agrees that its cooperation, as agreed to in Paragraph 3 of this Agreement, shall include, but is not limited to, the following, although HONEY HOLDING's cooperation shall not include production of materials covered by the attorney-client privilege or the work product doctrine:

(a)     Completely and truthfully disclosing all information as may be requested by the USAO NDIL with respect to the activities of HONEY HOLDING and its present and former board of directors, general partner, limited partners, agents, officers, executives, and employees, as well as any brokers, counter parties, other third parties, and customers concerning all matters inquired into by the USAO NDIL;

(b)     Assembling, organizing, and timely providing on request from the USAO NDIL all documents, records, or other tangible evidence in HONEY HOLDING's possession, custody, or control;

(c)     Using its best efforts to make available its present and former board of directors, general partner, limited partners, agents, officers, executives, and employees to provide information and/or testimony as requested by the USAO NDIL, including sworn testimony before a federal grand jury or in federal trials, as

2

well as interviews with federal law enforcement authorities. Cooperation under this Agreement will include identification of witnesses who, to HONEY HOLDING's knowledge and belief, may have material information regarding the matters under investigation;

(d)     Providing testimony and other information deemed necessary by the USAO NDIL or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any criminal or other proceeding as requested by the USAO NDIL; and

(e)     Disposing according to law any non-adulterated honey from purchase order 832 from Jun Yang and/or National Honey, Inc., which did business as National Commodities Company, and depositing the proceeds from any sale of such honey with the Clerk of the Court to be applied as payment toward the restitution judgment in United States v. Jun Yang, 13 CR 139 (Kocoras, J.), and which sum shall be $886,965.25 and shall be paid no later than April 1, 2013.

## Fine

5.     HONEY HOLDING agrees to pay $1,000,000 to the United States as a monetary penalty, subject to the payment schedule and the assessment of additional potential penalties (the "penalty") set forth in Appendix B (the "Security Agreement"). If HONEY HOLDING fails to fulfill its obligations to pay the penalty and is deemed in default under the terms of the Security Agreement, HONEY HOLDING agrees and stipulates to the entry of a judgment against it as set forth in the Security Agreement and shall fully cooperate in that process. The parties have agreed to the penalty based on HONEY HOLDING's financial ability to pay, as confirmed by financial statements and other representations made by HONEY HOLDING and its representatives to the United States, under penalty of perjury and prosecution for false statements. HONEY HOLDING understands that any misrepresentations concerning its financial status would constitute a material breach of this Agreement.

6.     If HONEY HOLDING materially breaches this Agreement as determined by the USAO NDIL within its exclusive discretion, any monies paid by HONEY HOLDING to the United States shall not be returned to HONEY HOLDING and any outstanding sums still owed to the United States shall remain due to the United States. The USAO NDIL agrees, however, to recommend to the Court that the amount paid pursuant to this Agreement should be offset against whatever fine the Court shall impose as part of its judgment in the event of a subsequent prosecution against HONEY HOLDING.

## Deferral of Prosecution

7.    In consideration of HONEY HOLDING's extensive cooperation, including its agreement to allow an undercover law enforcement agent to assume the role of HONEY HOLDING's Director of Procurement in an undercover capacity since June 2011, as well its remedial actions to date, and its willingness to (i) accept and acknowledge responsibility for the conduct of its employees and agents as detailed in the Factual Statement; (ii) have already implemented and continue further implementation of new, enhanced remedial actions as specified in Exhibit B; (iii) demonstrate its future good conduct and full compliance with U.S. importation laws, the FDCA, and other federal laws; (iv) educate customers and other industry participants regarding illegally transshipped, illegally misdeclared, and unsafe or unwholesome products, including honey; (v) continue its cooperation with the USAO NDIL, law enforcement, and other government agencies as specified in Paragraphs 3 and 4; (vi) dispose according to law any honey specified in Paragraph 4(e); and (vii) pay the monetary penalty set forth in Paragraph 5, and because the USAO NDIL is unaware of other instances in which HONEY HOLDING transacted in honey adulterated with antibiotics other than as described in the Factual Statement, the USAO NDIL shall recommend to the Court, pursuant to Title 18, United States Code, Section 3161(h)(2), that prosecution of HONEY HOLDING on the Information filed pursuant to Paragraph 1 be deferred for a period of twenty-four months from the date of the Court's Order. Specifically, upon execution of this Agreement, and pursuant to Title 18, United States Code, Section 3161(h)(2), the USAO NDIL shall move, unopposed by HONEY HOLDING, to present this Agreement to the Court and move for a continuance of all further criminal proceedings, including trial, for a period of twenty-four months, for speedy trial exclusion of all time covered by such a continuance, and for approval by the Court of this deferred prosecution.

8.    The USAO NDIL agrees that if HONEY HOLDING has not committed a material breach of this Agreement for twenty-four months from the date of the Court's Order deferring prosecution, the USAO NDIL shall seek dismissal with prejudice of the Information filed against HONEY HOLDING pursuant to Paragraph 1, and this Agreement shall expire and be of no further force or effect.

## Government Commitment

9.    Except in the event of a material breach of this Agreement, during the term of this Agreement and upon expiration of this Agreement as set forth in Paragraph 8, the USAO NDIL shall not further pursue investigations relating to the matters set forth in the Factual Statement that have been, or could have been,

conducted by the USAO NDIL prior to the date of this Agreement as to HONEY HOLDING.

## Court Not Bound

10.    HONEY HOLDING and the USAO NDIL understand that the Agreement to defer prosecution of HONEY HOLDING must be approved by the Court, in accordance with Title 18, United States Code, Section 3161(h)(2). Should the Court decline to approve this Agreement for any reason, both the USAO NDIL and HONEY HOLDING are released from any obligation imposed upon them by this Agreement and this Agreement shall be null and void.

## Waiver of Rights

11.    HONEY HOLDING agrees to waive and hereby expressly waives all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Northern District if Illinois for the period that this Agreement is in effect.

12.    In case of a material breach of this Agreement, any prosecution of HONEY HOLDING relating to the information and facts contained in the Factual Statement or any crime arising therefrom may be commenced against HONEY HOLDING notwithstanding the expiration of any applicable statute of limitations. HONEY HOLDING knowingly waives any defense or claim based upon the statute of limitations or upon the timeliness with which the charge in the Information was brought. HONEY HOLDING's waiver of the statute of limitations is knowing and voluntary and in express reliance on the advice of counsel. Upon the successful completion of this Agreement, all applicable statutes of limitations shall be in effect.

## Breach of this Agreement

13.    Should the USAO NDIL determine that HONEY HOLDING has committed a material breach of any provision of this Agreement, the USAO NDIL shall provide written notice to HONEY HOLDING of the alleged breach, and provide HONEY HOLDING with a thirty day (30) period, or longer at the reasonable discretion of the USAO NDIL, in which to make a presentation to the USAO NDIL, to demonstrate that no material breach has occurred, or, to the extent applicable, has been cured. The parties expressly understand and agree that should HONEY HOLDING fail to request an opportunity to present facts in mitigation within a two-week period of the potential breach, it shall be conclusively

presumed that HONEY HOLDING is in material breach of this Agreement. The parties further understand and agree that the USAO NDIL's exercise of discretion under this Paragraph is not subject to review in any court or tribunal outside of the Department of Justice. In the event of a material breach of this Agreement that results in a prosecution of HONEY HOLDING, such prosecution may be premised upon any information of which law enforcement is aware as well as any information provided by or on behalf of HONEY HOLDING to the USAO NDIL or any other government agency. As set forth in Paragraph 2 of this Agreement, HONEY HOLDING shall not contest or otherwise challenge the admissibility into evidence of the Factual Statement, the facts contained within the Factual Statement, or any other document, testimony, or other evidence the USAO NDIL might use in any criminal prosecution against HONEY HOLDING in the event of a material breach of this Agreement.

## Requirement to Obey the Law

14.     Should the USAO NDIL determine during the term of this Agreement that HONEY HOLDING has committed any federal crime commenced subsequent to the date of this Agreement, HONEY HOLDING shall, in the sole discretion of the USAO NDIL, thereafter be subject to prosecution for any federal crimes of which the USAO NDIL has knowledge, including but not limited to the conduct described in the Factual Statement.

## Public Statements

15.     HONEY HOLDING expressly agrees that it shall not, through its present or future attorneys, board of directors, general partner, limited partners, agents, officers, executives, or employees, make any public statement contradicting any statement of fact contained in the Factual Statement. Any such contradictory public statement by HONEY HOLDING, its attorneys, board of directors, general partner, limited partners, agents, officers, executives, or employees shall constitute a material breach of this Agreement as governed by Paragraph 13 of this Agreement, and HONEY HOLDING shall thereafter be subject to prosecution pursuant to the terms of this Agreement.

16.     The decision of whether any statement subject to Paragraph 15 of this Agreement contradicts a fact contained in the Factual Statement and should be imputed to HONEY HOLDING for purposes of determining whether HONEY HOLDING has breached this Agreement shall be in the sole and reasonable discretion of the USAO NDIL. Upon the government's notification to HONEY HOLDING of a public statement by any such person that in whole or in part

contradicts a statement of fact contained in the Factual Statement, HONEY HOLDING may avoid a breach of this Agreement by publicly repudiating such statement within two business days after notification by the government. This Paragraph is not intended to apply to any statement made by any individual in the course of any criminal, regulatory, or civil case initiated by a governmental or private party against such individual. In addition, consistent with HONEY HOLDING's obligation not to contradict any statement of fact set forth in the Factual Statement, HONEY HOLDING may take good faith positions in litigation involving any person or entity not a party to this Agreement. Nothing stated in this Agreement is intended to operate or shall operate as a waiver of HONEY HOLDING's rights under Federal Rule of Evidence 408.

### Additional Terms

17.     HONEY HOLDING agrees that, if HONEY HOLDING's business operations are sold to a party or parties affiliated or unaffiliated with HONEY HOLDING as of the date of this Agreement, whether by sale of stock, merger, consolidation, sale of a significant portion of its assets, or other form of business combination, or otherwise undergoes a direct or indirect change of control during the term of this Agreement, HONEY HOLDING shall include in any such contract or instrument a provision binding the purchaser/successor to all the obligations described in this Agreement.

18.     It is further understood that this Agreement is binding on HONEY HOLDING and the USAO NDIL, but specifically does not bind any other federal agencies, or any state or local authorities, although the USAO NDIL will bring the cooperation of HONEY HOLDING and its compliance with its other obligations under this Agreement to the attention of federal, state, or local prosecuting offices or regulatory agencies, if requested by HONEY HOLDING or its attorneys. It is understood that this Agreement also excludes any natural persons. It is the intent of the parties to this Agreement that the Agreement does not confer or provide any benefits, privileges or rights to any individuals or other entities other than the parties hereto, and that nothing in the Agreement shall be admissible in any proceeding other than a proceeding brought by the USAO NDIL. Moreover, HONEY HOLDING may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not otherwise violate any term of this Agreement.

19.     It is further understood that this Agreement does not relate to or cover any criminal conduct by HONEY HOLDING other than the conduct described in the Factual Statement.

20.     HONEY HOLDING understands that it has the right to retained counsel of its choice, and to a conflict free counsel. Understanding this, HONEY HOLDING knowingly waives any claim arising from the fact that its counsel also represents co-defendant Douglas A. Murphy. HONEY HOLDING has had the opportunity to consult with independent counsel concerning this waiver, and has knowingly declined to do so.

21.     HONEY HOLDING and the USAO NDIL agree that, upon acceptance by the Court, this Agreement and an Order deferring prosecution shall be publicly filed in the United States District Court for the Northern District of Illinois, Eastern Division.

22.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between HONEY HOLDING and the USAO NDIL. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the USAO NDIL, HONEY HOLDING's attorneys, and a duly authorized HONEY HOLDING's representative.

23.     HONEY HOLDING and its attorneys acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement to cause HONEY HOLDING to enter into this Agreement.

**AGREED:**

**FOR HONEY HOLDING I, LTD.**

2-12-13
_____
DATE

_Thomas D Kennedy_
THOMAS D. KENNEDY
Duly Authorized Representative
HONEY HOLDING I, LTD.

**FOR THE UNITED STATES ATTORNEY'S OFFICE FOR THE
NORTHERN DISTRICT OF ILLINOIS**

_____
DATE

_____
GARY S. SHAPIRO
United States Attorney
Northern District of Illinois

_____
ANDREW S. BOUTROS
Assistant United States Attorney

**AGREED:**

**FOR HONEY HOLDING I, LTD.**

_____              _____
            DATE                                    THOMAS D. KENNEDY
                                                    Duly Authorized Representative
                                                    HONEY HOLDING I, LTD.


**FOR THE UNITED STATES ATTORNEY'S OFFICE FOR THE
NORTHERN DISTRICT OF ILLINOIS**

_02/12/2013_____              _Gary S. Shapiro /mss_____
            DATE                                    GARY S. SHAPIRO
                                                    United States Attorney
                                                    Northern District of Illinois

                                                    _____
                                                    ANDREW S. BOUTROS
                                                    Assistant United States Attorney

9

## CERTIFICATE OF CONSENT

1.     HONEY HOLDING I, LTD., d/b/a Honey Solutions agrees and consents to the entry of the Deferred Prosecution Agreement with the United States Attorney's Office for the Northern District of Illinois;

2.     HONEY HOLDING's Duly Authorized Agent, Mr. Thomas D. Kennedy, is authorized, empowered and directed, on behalf of HONEY HOLDING and its General Partner HHI Management, LLC to execute the Deferred Prosecution Agreement with such changes as Mr. Kennedy and HONEY HOLDING's outside counsel may approve; and

3.     Outside counsel and Mr. Kennedy are authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing.

HONEY HOLDING I, LTD., d/b/a
By and through its General Partner
HHI Management, LLC

2/11/2013
DATE

_Lee Ann S. Murphy_
HHI Management, LLC

_Lee Ann S. Murphy_
Printed Name

President
Capacity

10

## AUTHORIZED REPRESENTATIVE'S CERTIFICATE

I, Thomas D. Kennedy, the duly authorized representative of HONEY HOLDING I, LTD., d/b/a Honey Solutions, and its General Partner HHI Management LLC, expressly acknowledge the following: (1) I have the authority to sign this Deferred Prosecution Agreement; (2) I have read this entire Agreement; (3) I have had an opportunity to discuss this Agreement fully and freely with HONEY HOLDING and its General Partner; (4) to the best of my knowledge and belief HONEY HOLDING and its General Partner fully and completely understand each and every one of its terms and the Agreement's consequences; (5) to the best of my knowledge and belief HONEY HOLDING and its General Partner are fully satisfied with the advice and representation provided by legal counsel; and (6) HONEY HOLDING has signed this Agreement voluntarily.


2-12-13
DATE

Thomas D. Kennedy
Duly Authorized Representative
HONEY HOLDING I, LTD. and
HHI Management, LLC

## COUNSEL'S CERTIFICATE

The undersigned are outside counsel for HONEY HOLDING I, LTD., d/b/a Honey Solutions. In connection with such representation, we acknowledge that we have: (1) discussed this Agreement with our client, HONEY HOLDING; (2) fully explained each one of its terms to HONEY HOLDING; (3) fully answered each and every question put to us by HONEY HOLDING regarding this Agreement; and (4) believe HONEY HOLDING completely understands all of this Agreement's terms and its consequences.

MONICO & SPEVACK

2/12/13
_____
DATE

_____
Michael D. Monico
Counsel for HONEY HOLDING I, LTD.

_____
Theodore R. Eppel
Counsel for HONEY HOLDING I, LTD.

## Exhibit A

## FACTUAL STATEMENT

HONEY HOLDING I, LTD., d/b/a HONEY SOLUTIONS admits and agrees that on or about December 11, 2006, at Chicago, in the Northern District of Illinois, Eastern Division, HONEY HOLDING, with intent to defraud and mislead, did cause to be introduced and delivered for introduction, into interstate commerce, articles of food intended for human consumption, that is, honey from HONEY HOLDING's purchase order 461 (Alfred L. Wolff, Inc.'s purchase order 995) that was adulterated within the meaning of Title 21, United States Code, Section 342(a)(2)(C)(i), in that the honey contained an unsafe food additive, that is, Chloramphenicol, an antibiotic not authorized in honey, by authorizing the purchase and delivery of the adulterated honey, which arrived at HONEY HOLDING's facility in Baytown, Texas on or about December 14, 2006, in violation of Title 21, United States Code, Sections 331(a), 333(a)(2), 348(a), and Title 18, United States Code, Section 2. More specifically,

1.     HONEY HOLDING was a large industrial honey supplier in the United States, with its principal place of business in Baytown, Texas.

2.     Douglas A. Murphy was Director of Sales at HONEY HOLDING and between in or about 2003 and May 2008, was responsible for the purchase of wholesale quantities of honey, maintaining relationships with wholesale honey suppliers, and the sale of honey to United States customers, including industrial end users. At all times material to this Agreement, Murphy was acting within the scope of his employment, with intent to benefit HONEY HOLDING, and in the course of the discharge of his duties.

3.     Alfred L. Wolff GmbH ("ALW Germany") was a German international trading company headquartered and with its principal place of business in Hamburg, Germany, that purchased, imported, exported, distributed, sold, and processed food products, including honey. ALW Germany had subsidiaries, affiliates, and representative offices located throughout the world (collectively "ALW Food Group"), including Alfred L. Wolff, Inc. in Chicago, Illinois ("ALW USA").

4.     On or about November 19, 2006, ALW USA filed and caused to be filed CBP entry forms 3461 and 7501 for the three container loads of Polish-origin honey from purchase order 995, one container of which was adulterated with Chloramphenicol at a level of 0.6 parts per billion.

1

5.     Thereafter, Murphy caused HONEY HOLDING to issue purchase order 461 and in doing so, agreed to purchase from ALW Food Group the adulterated container of honey from ALW Food Group's purchase order 995 at a discounted price of 65 cents per pound, with the price reflecting duties paid and delivery to Texas, and did so knowing that the honey was adulterated with Chloramphenicol. HONEY HOLDING intended to introduce the adulterated honey into the stream of commerce of the United States knowing that the honey was adulterated with Chloramphenicol and intended to conceal from HONEY HOLDING's customers and government authorities that the honey was so adulterated.  In fact, HONEY HOLDING sold the adulterated honey to customers without disclosing its adulterated nature and by falsely representing that it did not contain a prohibited antibiotic.

6.     As a result of this scheme, HONEY HOLDING, defrauded HONEY HOLDING's downstream customers of approximately $26,624 in that adulterated honey from purchase order 461 processed and sold by HONEY HOLDING at the direction of Murphy had no value, yet was sold and delivered to HONEY HOLDING's customers.

In addition to the foregoing, HONEY HOLDING admits and agrees that the following conduct constitutes relevant conduct under United States Sentencing Guidelines §1B1.3 and is expressly included as part of this Factual Statement:

7.     Urbain Tran was an agent of HONEY HOLDING's since about 2006 whose primary responsibility was to locate, arrange, and source honey for HONEY HOLDING.  Despite HONEY HOLDING's written policies to the contrary, Tran brokered transactions in which HONEY HOLDING purchased Chinese-origin honey from at least seven shell and front companies that were controlled by Chinese honey producers and manufacturers, including "Chinese Transshipper 1," "Chinese Transshipper 2," and "Chinese Transshipper 3." These shell and front companies included AHCOF USA Inc.; Bo Bay Corporation; Chengda Trading Limited;  Glory Spring Enterprise Co., Ltd.; Pineco Import/Export Ltd.; Silver Spoon Int'l Inc.; and Sweet Campo Co., Ltd.  At all times material to this Agreement, Tran was acting within the scope of his agency relationship, with intent to benefit himself and HONEY HOLDING, and in the course of the discharge of his duties.

8.     Sweet Campo Co. Ltd. was a shell import company controlled by Chinese Transshipper 1 to falsely and fraudulently import and enter Chinese-origin honey into the United States without paying antidumping duties and at times,

2

honey assessment fees, which honey Sweet Campo sold to HONEY HOLDING through transactions brokered by Tran.

9.      Between about 2007 and in or around June 2011, after which time, and with the consent and cooperation of HONEY HOLDING, an undercover law enforcement agent was placed into HONEY HOLDING as its Director of Procurement, Tran, as part of a fraudulent practice to enter and introduce and cause others to enter and introduce and attempt to enter and introduce Chinese-origin honey into the commerce of the United States in avoidance of U.S.-imposed antidumping duties and at times, honey assessment fees, arranged for HONEY HOLDING to purchase from at least seven shell and front companies, hundreds of shipping containers of Chinese-origin honey valued at approximately $12,319,201, even though Tran knew that the honey was falsely and fraudulently imported, entered, marketed and sold as non-Chinese honey and at other times, as sugars and syrups, which fraudulent practice caused losses to the United States of approximately $33,403,125.

10.     As part of the fraudulent practice, Tran obtained and caused others at HONEY HOLDING to receive fake and fraudulent bills of lading, invoices, packing lists, country of origin certificates, and other papers, which Tran knew to be fake and fraudulent and which records had been used to falsely and fraudulently declare Chinese-origin honey as having originated from countries other than China, including Cambodia, Malaysia, Mongolia, Russia, and Vietnam, and at times, as sugars and syrups, and coordinated with freight forwarding companies to cause hundreds of shipping containers of fraudulently entered Chinese-origin honey to be delivered to HONEY HOLDING.

11.     As part of the fraudulent practice, between about 2009 and 2012, Tran accepted approximately $330,941 in undisclosed payments from Chinese honey producers and manufacturers in exchange for TRAN brokering transactions with their companies while knowing these producers and manufacturers were illegally transshipping and illegally misdeclaring Chinese-origin honey that was being purchased by HONEY HOLDING.

12.     As part of the fraudulent practice, Tran communicated by email and telephone with others, including in the Northern District of Illinois, in furtherance of HONEY HOLDING purchasing and receiving illegally misdeclared Chinese-origin honey that avoided U.S.-imposed antidumping duties and honey assessment fees.

## Exhibit B

## COMPLIANCE PROGRAM

Goods shipped from a country of origin to a country of intermediate destination, mislabeled as to country of origin, and that ultimately pass through a customhouse at the port of final destination and enter into the United States as a misdeclared product, are considered illegally "transshipped." Specifically, Chinese-origin honey imported into the United States through third countries and mislabeled and declared as originating from a third country is illegally "transshipped." Chinese-origin honey imported and entered into the United States as originating from a country other than China, even if not transshipped, is considered an illegally misdeclared product. Similarly, Chinese-origin honey imported and entered into the United States as a product other than honey, including, for example, molasses, fructose, rice syrup, glucose syrup, honey syrup, and apple juice concentrate is also considered an illegally misdeclared product. The United States assesses antidumping duties on Chinese-origin honey and honey assessment fees on all honey. Illegally transshipped, mislabeled, and misdeclared Chinese-origin honey can avoid these duties and fees, in violation of U.S. law. Furthermore, illegally transshipped, mislabeled, and misdeclared honey can create a two-tier pricing structure for honey: higher prices for buyers and sellers unwilling to transact in transshipped, mislabeled, and misdeclared honey and cheaper prices for those willing to do so or who are otherwise indifferent.

The Food, Drug, and Cosmetic Act ("FDCA") and Food Safety Modernization Act ("FSMA") are designed to ensure that foods are safe, wholesome, sanitary, and properly labeled.

The purpose of this Corporate Compliance Program is to ensure that HONEY HOLDING I, LTD., d/b/a HONEY SOLUTIONS maintains supply chain integrity and conducts reasonable, good-faith country-of-origin inquiries reasonably designed to ensure that HONEY HOLDING is able to track and trace its domestic and imported products, as well as avoid transacting in illegally transshipped, illegally misdeclared, and unsafe or unwholesome products, including honey.

To prevent and address deficiencies in its policies and procedures regarding full compliance with U.S. importation and customs laws, the FDCA and FSMA, and other federal laws relating to honey and other products (collectively, the "traceability and food laws"), HONEY HOLDING agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its internal controls, existing policies, and procedures.

Where necessary and appropriate, HONEY HOLDING agrees to adopt new or to modify existing policies and procedures to ensure that it maintains a rigorous compliance code, standards, and procedures designed to detect and deter violations of the traceability and food laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of HONEY HOLDING's existing policies and procedures:

1.     A clearly articulated corporate policy, adopted by formal resolution of HONEY HOLDING's General Partner, against violations of the traceability and food laws. Among other things, the corporate policy shall make clear that it is a federal crime for anyone to fraudulently or knowingly import or bring into the United States, any merchandise contrary to law (including U.S. importation and customs laws, the FDCA and FSMA), or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

2.     Promulgation of compliance standards and procedures designed to reduce the prospect of violations of the traceability and food laws and HONEY HOLDING's compliance code and appropriate measures to encourage and support the observance of ethics and compliance standards and procedures against traceability violations at all levels of the company. These standards and procedures shall apply to all directors, officers, executives, and employees, and where necessary, appropriate, and practical, outside parties acting on behalf of or for the benefit of HONEY HOLDING, including, but not limited to, agents, brokers, traders, representatives, manufacturers, producers, processors, distributors, teaming partners, joint venture partners, and others (collectively, "agents, brokers, and others").

3.     Development of these compliance standards and procedures, including ethics and compliance programs on the basis of a risk assessment addressing the individual circumstances of each honey purchasing transaction, including, but not limited to: (a) market conditions at the time of the transaction, as well as (b) reasonable country-of-origin and supply chain inquiries, including a review of the honey's:

>          (i) paperwork, markings, and labels, or lack, incompleteness, or tampering thereof;
>          (ii) verified container numbers;
>          (iii) drum conditions and color;
>          (iv) price;
>          (v) volume;

2

(vi) sales condition, including spot buy versus long-term contract;

(vii) claimed country of origin, including the honey production outputs of the claimed country, whether the claimed origin has been used as a transshipping route, and whether the country is a historic net consumer or exporter of its honey;

(viii) seller, agent, or broker and each's track record and business practices, including use of affiliates or third parties to import into the United States, a higher risk practice than directly serving as the importer of record;

(ix) claimed manufacturer, factory, producer, or processor and the good-faith due diligence and supply chain audits conducted thereof, if any, including the willingness and extent of access granted for the audits; thoroughness, scope, and frequency of the audits; and the training, expertise, and credibility of the auditor; and

(x) claimed importer of record and any information or background relating to the same.

4.      Periodic review of its compliance standards and procedures, including ethics and compliance programs, taking into account relevant developments in the field and evolving industry standards, and update and adapt as necessary to ensure the continued effectiveness of the company's ethics and compliance programs in detecting and reducing violations of the traceability and food laws and HONEY HOLDING's compliance code.

5.      Mechanisms designed to ensure that HONEY HOLDING's policies, standards, and procedures regarding the traceability and food laws are effectively communicated to all directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others.    These mechanisms shall include: (a) periodic training for all directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others; and (b) annual certifications by all such directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others, certifying compliance with the training requirements.

6.      An effective system for receiving, reporting, handling, and addressing suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the traceability and food laws for directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others, as to known complaints that arise internally and externally of the company.

7.      Appropriate disciplinary procedures to address, among other things,

3

violations of the traceability and food laws and HONEY HOLDING's compliance code by HONEY HOLDING's directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others. HONEY HOLDING shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent future similar misconduct, including assessing the ethics and compliance program and making modifications as necessary to ensure the program is effective.

8.  Appropriate due diligence and compliance requirements pertaining to the retention and oversight of agents, brokers, and others, including: (a) informing agents, brokers, and others of HONEY HOLDING's commitment to abiding by the traceability and food laws, and of HONEY HOLDING's ethics and compliance standards and procedures or other measures for preventing and detecting violations of those laws; and (b) seeking a reciprocal commitment from agents, brokers, and others.

9.  Standard provisions in agreements, contracts, and renewals thereof with all agents, brokers, and others that are reasonably calculated to prevent violations of the traceability and food laws, which may, depending upon the circumstances, include: (a) traceability representations and undertakings relating to compliance with the traceability and food laws; (b) rights to conduct supply chain audits of the agents, brokers, and others to ensure compliance with the foregoing; and (c) rights to terminate an agent or broker as a result of any breach of the traceability and food laws, and regulations or representations and undertakings related to such matters.

10.  Educating HONEY HOLDING's customers of HONEY HOLDING's polices and procedures regarding the traceability and food laws to better prevent HONEY HOLDING's customers from buying or otherwise transacting in illegally transshipped, illegally misdeclared, and unsafe or unwholesome products, including honey.

# Appendix A

JUDGE BUCKLO

FEB 1 2 2013

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MAGISTRATE JUDGE GILBERT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. **13CR0138** |
| | ) | |
| v. | ) | Violation: Title 21, United States |
| | ) | Code, Sections 331(a), 333(a)(2), |
| DOUGLAS A. MURPHY and | ) | 342(a)(2)(C)(i), and 348(a); Title 18, |
| HONEY HOLDING I, LTD., | ) | United States Code, Sections 3147 and |
| d/b/a Honey Solutions | ) | 2 |

The UNITED STATES ATTORNEY charges:

At times material to this information:

1.     The Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, ensured that foods are safe, wholesome, sanitary, and properly labeled. The FDCA defined "food" to include "articles used for food or drink for man or other animals" and components of such food. The FDCA prohibited the delivery and introduction, and causing the delivery and introduction, into interstate commerce of "adulterated" food. Food was considered "adulterated" if, among other reasons, it contained "food additives" for which there was no regulation prescribing the conditions under which it may be safely used in food, nor an exemption allowing its use in food. Chloramphenicol was an antibiotic for which there was no regulation prescribing the conditions under which it could be safely used in honey, nor an exemption allowing its use in honey. Thus, Chloramphenicol was an unsafe food additive, and its presence in honey caused the honey to be adulterated under the FDCA.

1

2.      Defendant HONEY HOLDING I, LTD., d/b/a HONEY SOLUTIONS, was a large industrial honey supplier in the United States, with its principal place of business in Baytown, Texas.

3.      Defendant DOUGLAS A. MURPHY was Director of Sales at HONEY HOLDING and between in or about 2003 and May 2008, was responsible for the purchase of wholesale quantities of honey, maintaining relationships with wholesale honey suppliers, and the sale of honey to United States customers, including industrial end users.

4.      Alfred L. Wolff GmbH ("ALW Germany") was a German international trading company headquartered and with its principal place of business in Hamburg, Germany, that purchased, imported, exported, distributed, sold, and processed food products, including honey.  ALW Germany had subsidiaries, affiliates, and representative offices located throughout the world (collectively "ALW Food Group"), including Alfred L. Wolff, Inc., in Chicago, Illinois ("ALW USA").

5.      On or about November 19, 2006, ALW USA caused to be filed CBP entry forms 3461 and 7501 for three container loads of Polish-origin honey from purchase order 995, one container of which was adulterated with Chloramphenicol at a level of 0.6 parts per billion.

6.      In or about December 2006, while acting within the scope of his employment and with the intent to benefit defendant HONEY HOLDING, defendant DOUGLAS A. MURPHY while in the course of the discharge of his

duties, caused HONEY HOLDING to issue purchase order 461 and in doing so, agreed to purchase from ALW Food Group the adulterated container of honey from ALW Food Group's purchase order 995 at a discounted price of approximately $26,624, with the price reflecting a cost of 65 cents per pound of honey and with duties paid and delivery to Texas, and did so knowing that the honey was adulterated with Chloramphenicol.

7.      Defendants DOUGLAS A. MURPHY and HONEY HOLDING intended to introduce the adulterated honey into the stream of commerce of the United States knowing that the honey was adulterated with Chloramphenicol and intended to conceal from their customers and government authorities that the honey was so adulterated.

8.      Defendants DOUGLAS A. MURPHY and HONEY HOLDING sold the adulterated honey to customers knowing that the honey was adulterated and prohibited from entering into the commerce of the United States.

9.      On or about December 11, 2006, at Chicago, in the Northern District of Illinois, Eastern Division,

DOUGLAS A. MURPHY, and
HONEY HOLDING I, LTD.,

defendants herein, with intent to defraud and mislead, did cause to be introduced and delivered for introduction into interstate commerce articles of food intended for human consumption, that is, honey from HONEY HOLDING's purchase order 461 (ALW USA's purchase order 995) that was adulterated within the meaning of Title

3

21, United States Code, Section 342(a)(2)(C)(i), in that the honey contained an unsafe food additive, that is, Chloramphenicol, an antibiotic not authorized in honey, by authorizing the purchase and delivery of the adulterated honey, which arrived at HONEY HOLDING's facility in Baytown, Texas on or about December 14, 2006;

In violation of Title 21, United States Code, Sections 331(a), 333(a)(2), 348(a), and Title 18, United States Code, Section 2; and

DOUGLAS A. MURPHY,

defendant herein, committed the offense while on release pending appeal pursuant to an order of the United States District Court for the Southern District of Texas, in violation of Title 18, United States Code, Section 3147.

UNITED STATES ATTORNEY

4

# Appendix B

# DEFERRED PROSECUTION
# PAYMENT AGREEMENT AND SECURITY AGREEMENT

This Deferred Prosecution Payment Agreement and Security Agreement ("Agreement") is entered into by and between the United States of America, acting through the United States Attorney for the Northern District of Illinois, and HONEY HOLDING I, LTD., d/b/a Honey Solutions, a Texas limited partnership and its General Partner HHI Management, LLC, through their Duly Authorized Representative Thomas D. Kennedy, for the purpose of enforcing and securing the payment provisions set forth in Paragraph 5 of the Deferred Prosecution Agreement.

## II.  RECITALS

1.    A one-count Information was filed in the United States District Court for the Northern District of Illinois, charging HONEY HOLDING with a felony violation of the Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Section 301 *et seq*.

2.    The United States and HONEY HOLDING entered into a Deferred Prosecution Agreement in which Paragraph 5 provided for HONEY HOLDING to pay the United States a monetary penalty in the amount of $1,000,000 ("Monetary Penalty") to resolve the charge contained in the Information and other relevant conduct under United States Sentencing Guidelines §1B1.3.

3.    This Agreement sets forth the payment schedule for payment of the Monetary Penalty, including any potential delinquent or default penalties resulting from late quarterly payments not made pursuant to this payment schedule, and secures the payment and performance of all obligations under the Deferred Prosecution Agreement.

## III.  TERMS AND CONDITIONS

### 1.    **Obligations Secured**

As set forth in Paragraph 5 of the Deferred Prosecution Agreement, HONEY HOLDING shall pay the total sum of $1,000,000 to the United States as a monetary penalty.   HONEY HOLDING shall make all payments as set forth in this Agreement by sending checks, with the case number noted on each check, made payable to the United States Treasury and mailed to:

1

Clerk of the Court for the Northern District of Illinois
219 South Dearborn Street, 20th Floor
Chicago, Illinois 60604

with a copy to Counsel for the United States, pursuant to the payment schedule set forth below:

a.　Upon execution and filing of the Deferred Prosecution Agreement in Court, HONEY HOLDING shall pay to the United States the sum of twenty thousand dollars ($20,000);

b.　Commencing on June 30, 2013 and continuing until HONEY HOLDING has made full payment of the Monetary Penalty to the United States, HONEY HOLDING shall make quarterly payments to the United States each in the amount of one hundred forty thousand dollars ($140,000) ("Quarterly Payment"). The Quarterly Payment shall be made on June 30, 2013, September 30, 2013, December 30, 2013, March 30, 2014, June 30, 2014, September 30, 2014, and December 30, 2014 (each of the foregoing referred to as the "Installment Date"). In the event that HONEY HOLDING fails to make a Quarterly Payment within 30 days of the Installment Date, HONEY HOLDING shall be deemed to be delinquent in its Quarterly Payment and shall be required to pay an additional $100,000 penalty ("Delinquent Penalty Payment") to the United States; and

c.　If HONEY HOLDING fails to make the delinquent Quarterly Payment and/or the Delinquent Penalty Payment by the next Installment Date, HONEY HOLDING shall be deemed to be in default under the terms of this Agreement ("Default Date") and HONEY HOLDING shall be required to pay a $150,000 penalty ("Default Penalty Payment"), in addition to the delinquent Quarterly Payment and the Delinquent Penalty Payment. Once HONEY HOLDING is deemed in default, all delinquent Quarterly Payments, the Delinquent Penalty Payment, and the Default Penalty Payment must be paid within 30 days of the Default Date or the entire outstanding balance of the Monetary Penalty shall become due and payable and an additional penalty in the amount of $2,000,000 ("Material Breach Penalty Payment") shall be assessed against HONEY HOLDING. In addition to the Monetary Penalty, additional penalty payments up to a total of $2,500,000 may be imposed pursuant to this Agreement.

A payment made by certified mail return receipt shall be considered made when deposited in the United States mail.

HONEY HOLDING shall have the right, but not the obligation, to prepay without penalty any portion of its Monetary Penalty, including any Quarterly Payment.

## 2. <u>Grant of Security Interest/collateral Description</u>

For value received pursuant to the Deferred Prosecution Agreement, and to secure the United States' interest in receiving full payment of the Monetary Penalty, including potential Delinquent Penalty Payments, Default Penalty Payments, and the Material Breach Penalty Payment, HONEY HOLDING grants to the United States a security interest in all of HONEY HOLDING's property described below, now owned or hereafter acquired, together with all replacements, accessions, proceeds, and products (collectively "the Collateral"):

| | |
|---|---|
| a. Equipment | f. Chattel paper |
| b. Fixtures | g. General intangibles |
| c. Inventory | h. Documents |
| d. Accounts/Receivables | i. Deposit accounts |
| e. Instruments | j. Titled motor vehicles |

Unless otherwise specified, all terms used in this Agreement shall have the meanings ascribed to them under the Official Text of the Uniform Commercial Code, as it may be amended from time to time ("UCC"). The United States shall not exercise its rights to liquidate, take possession of, or exercise rights in or to the collateral so long as HONEY HOLDING has not failed to perform its payment obligations as set forth in this Agreement.

## 3. <u>HONEY HOLDING Certifications</u>

HONEY HOLDING certifies that: (a) all Collateral is owned or titled in the HONEY HOLDING's name and not in the name of any other organization or individual; (b) HONEY HOLDING has the legal authority to grant the security interest in the Collateral; (c) HONEY HOLDING's ownership in or title to the Collateral is free of all adverse claims, liens, or security interests, except:

a. The security interest of the Willam F. Schulte Family Trust in the HONEY HOLDING inventory shall be subordinated to United States' interests referenced herein.

3

b.      The security interest of Gulf Coast Bank and Trust encumbering accounts receivable and the security interest of Thermo Fisher Financial covering the TSQ Quantum Ultra System, HESI Probe, and Interfacing Customer Supplied Peripherals, which have been and disclosed to and acknowledged by the United States.

### 4.      Restrictions on Collateral Transfer

HONEY HOLDING shall not sell, lease, license, or otherwise transfer (including by granting security interests, liens, or other encumbrances in) all or any part of the Collateral or HONEY HOLDING's interest in the Collateral without the United States' written or electronically communicated approval, except that HONEY HOLDING may sell inventory in the ordinary course of lawful business on customary terms. HONEY HOLDING may collect and use amounts due on accounts and other rights to payment arising or created in the ordinary course of business, until notified otherwise by the United States in writing or by electronic communication.

### 5.      Maintenance and Location of Collateral; Inspection; Insurance

Except with respect to its sale of inventory in the ordinary course of lawful business on customary terms, HONEY HOLDING must promptly notify the United States by written or electronic communication of any change in location of the Collateral, specifying the new location. HONEY HOLDING hereby grants to the United States the right to inspect the Collateral at all reasonable times and upon reasonable notice. HONEY HOLDING must: (a) maintain the Collateral in good condition; (b) pay promptly all taxes, judgments, or charges of any kind levied or assessed thereon; (c) keep current all rent or mortgage payments due, if any, on premises where the Collateral is located; and (d) maintain hazard insurance on the Collateral, with an insurance company and in an amount no less than the replacement cost of that Collateral, and including such terms as the United States may require including a Lender's Loss Payable Clause in favor of United States. HONEY HOLDING hereby assigns to the United States any proceeds of such policies and all unearned premiums thereon and authorizes and empowers the United States to collect such sums and to execute and endorse in HONEY HOLDING's name all proofs of loss, drafts, checks, and any other documents necessary for the United States to obtain such payments.

6. **Perfection of Security Interest**

HONEY HOLDING consents, without further notice, to the United States' filing or recording of any documents necessary to perfect, continue, amend or terminate its security interest. Upon request of the United States, HONEY HOLDING must sign or otherwise authenticate all documents that the United States deems necessary at any time to allow the United States to acquire, perfect, continue or amend its security interest in the Collateral. HONEY HOLDING shall pay the filing and recording costs of any document relating to Secured Party's security interest.

7. **Bankruptcy/Insolvency**

HONEY HOLDING expressly warrants it has reviewed its financial situation and that HONEY HOLDING is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and will remain solvent following its payment to the United States hereunder. Further, both the United States and HONEY HOLDING expressly warrant that, in evaluating whether to execute this Agreement, the United States and HONEY HOLDING have (a) intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to HONEY HOLDING, within the meaning of 11 U.S.C. § 547(c)(1); and (b) concluded that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.

If within 91 days of the execution of this Agreement or of any payment made hereunder, HONEY HOLDING commences, or a third party commences, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, or reorganization of HONEY HOLDING (a) seeking to have any order for relief of HONEY HOLDING's debts, or seeking to adjudicate HONEY HOLDING as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee, custodian, or other similar official for HONEY HOLDING or for all or any substantial part of HONEY HOLDING's assets, HONEY HOLDING agrees as follows:

a. that the Monetary Penalty imposed by the Deferred Prosecution Agreement and the additional potential penalties set forth in this Agreement, including potential Delinquent Penalty Payments, Default Penalty Payments, and the Material Breach Penalty Payment, are for fines and penalties payable to, and for the benefit of, a governmental unit, and are not compensation for actual pecuniary loss and, therefore, pursuant to 11 U.S.C. § 523, the obligations are non-dischargeable;

5

b.   HONEY HOLDING's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. §§ 547 or 548, and HONEY HOLDING shall not argue or otherwise take the position in any such case, proceeding or action that (1) HONEY HOLDING's obligations under this Agreement may be avoided under 11 U.S.C. §§ 547 or 548; (2) HONEY HOLDING was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payment to the United States hereunder; or (3) the mutual promises, covenants and obligations set forth in this Agreement and the Deferred Prosecution Agreement do not constitute a contemporaneous exchange for new value given to HONEY HOLDING; and

c.   if HONEY HOLDING's obligations under this Agreement or the Deferred Prosecution Agreement are avoided for any reason, the United States, at its sole option and in its sole discretion, may rescind the Deferred Prosecution Agreement and prosecute HONEY HOLDING, as set forth in the Deferred Prosecution Agreement.

## 8.   **Governing Law/Federal Rights**

This Agreement shall be construed and enforced under federal law. The United States may use state or local procedures for filing papers, recording documents, giving notice, enforcing security interests or liens, and for any other purposes. By using such procedures, the United States does not waive any federal immunity from state or local control, penalty, tax or liability. As to this Agreement, HONEY HOLDING may not claim or assert any local or state law against the United States to deny any obligation, defeat any claim of the United States, or preempt federal law.

## 9.   **United States Rights**

All rights conferred in this Agreement on the United States are in addition to those granted to it by law and the Deferred Prosecution Agreement, and all rights are cumulative and may be exercised simultaneously. Failure of the United States to enforce any rights or remedies shall not constitute an estoppel or waiver of United States' ability to exercise such rights or remedies.

## 10.   **Severability**

If any provision of this Agreement is unenforceable, all other provisions remain in effect.

11.  **Counterparts**

This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.


**AGREED**:


**FOR HONEY HOLDING I, LTD.**

_2-13-13_
DATE

_Thomas D. Kennedy_
THOMAS D. KENNEDY
Duly Authorized Representative
HONEY HOLDING I, LTD.


**FOR THE UNITED STATES ATTORNEY'S OFFICE FOR THE NORTHERN DISTRICT OF ILLINOIS**


DATE

GARY S. SHAPIRO
United States Attorney
Northern District of Illinois


ANDREW S. BOUTROS
Assistant United States Attorney

7

11.   **Counterparts**

This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.


**AGREED:**


**FOR HONEY HOLDING I, LTD.**


| | |
|---|---|
| _____ | _____ |
| DATE | THOMAS D. KENNEDY |
| | Duly Authorized Representative |
| | HONEY HOLDING I, LTD. |


**FOR THE UNITED STATES ATTORNEY'S OFFICE FOR THE NORTHERN DISTRICT OF ILLINOIS**

02/12/2013
_____
DATE

_Gary S. Shapiro /mas_
_____
GARY S. SHAPIRO
United States Attorney
Northern District of Illinois

_____
ANDREW S. BOUTROS
Assistant United States Attorney

7

## AUTHORIZED REPRESENTATIVE'S CERTIFICATE

I, Thomas D. Kennedy, the duly authorized representative of HONEY HOLDING I, LTD., d/b/a Honey Solutions, and its General Partner HHI Management LLC, expressly acknowledge the following: (1) I have the authority to sign this Deferred Prosecution Payment Agreement and Security Agreement; (2) I have read this entire Agreement; (3) I have had an opportunity to discuss this Agreement fully and freely with HONEY HOLDING and its General Partner; (4) to the best of my knowledge and belief HONEY HOLDING and its General Partner fully and completely understand each and every one of its terms and the Agreement's consequences; (5) to the best of my knowledge and belief HONEY HOLDING and its General Partner are fully satisfied with the advice and representation provided by legal counsel; and (6) HONEY HOLDING has signed this Agreement voluntarily.


2-13-13
_____
DATE

_Thomas D Kennedy_
Thomas D. Kennedy
Duly Authorized Representative
HONEY HOLDING I, LTD. and
HHI Management, LLC

8